Good morning, Your Honors. Good morning. Thomas Sprite of Sarah LLP on behalf of the Appellant and the Plaintiff below, .Strategy. This case concerns the large number of fake accounts on Facebook's platform in violation of Facebook's authenticity policy and the fact that advertisers are wrongly charged for impressions delivered or actions generated by those accounts. Can I ask you at the outset, because I'm not clear from reading your brief, have you abandoned the argument that the class and your client was mischarged for click-based? In other words, there's two arguments. There's the click-based charging and there's the impression-based charging. And the district court said there's no evidence at all in the two campaigns that you did that you were ever charged for a fake account for click-based. And as I read your briefs, you seem to say we're not fighting about that anymore. We're fighting about impression-based. Am I wrong in reading it that way? Not exactly, Your Honor. I think what our argument really is, is it just limited to the invalid clicks? That's one portion of it. Okay. Because if it's not limited to it, tell me what evidence there is in the record that .Strategy was ever billed for an invalid click, was ever billed for an invalid click. Okay. Well, Your Honor, .Strategy . . . For the campaigns that it itself opted to have the billing to be based on clicks. In other words, at the beginning of the campaign, you say, the way we want you to bill us, Facebook, I'll call them Facebook, is we want you to bill us on the basis of clicks. And it turns out you pay about 70 cents a click when you go through the record. On all the other campaigns, you said, we want you to bill us on the basis of impressions. And for those impressions, it's less than a penny per impression that the billing eventually comes out to. So focus on the first ones for a second. The ones where you were billed 70 cents or so a click. It's a little different for each campaign. Is there any evidence that you were ever billed for an invalid click? Because you were on summary judgment, and the district court said it's put up or shut up time. They say they never billed you for an invalid click, and you never produced, as close as I can tell, you never produced any evidence that you were. Do I read the record wrong? I'm not sure I characterized it the same way you did, Your Honor, but I don't think you were doing that. Tell me what evidence you produced that for the click-based billings that you were ever billed for an invalid click. Okay. If I can just talk about, there were 55 ad campaigns. No. I'm talking about two. I understand your argument on the 55. I'm focusing very specifically on those two, because the judge said as to those two, you have produced no evidence that anything that you complain about ever occurred. And I want to know if you did produce any evidence as to those two. Put the other 55 aside for a second, that you were ever billed for what I'm going to call today an invalid click, which is to say a click from somebody on an account that did not correspond with Facebook's policies. Yes, Your Honor. The first campaign that was billed for on a click basis, Facebook no longer retained records that allowed us to see whether or not they were billed for an invalid click. So the answer for that one is no. There was no evidence in the record that showed they were billed for an invalid click. But there was no evidence of anything on the... What about the second campaign? The second campaign, when we asked for discovery six months or eight months before summary judgment, they produced data which showed at that time that there were no clicks that... So, and I know you make an argument that the judge should have allowed further discovery. Well, Your Honor... Put those aside for a second. Okay. I'm just trying to understand the record. As to those two campaigns, there is no evidence in the record that you were ever billed for an invalid click. Correct? That is correct. Okay. It's a long dance to get there. I understand your argument. You make a separate argument that the trial judge erred by not allowing further discovery. I don't see an argument that there ought to be an adverse inference drawn against Facebook because the records weren't there as to the first campaign. But put those aside. At least there's nothing in the record to contradict the judge's finding that there's nothing in the record. Well, Your Honor, on the 53 campaigns... Okay. Let's turn to the other ones. Yes. Let's turn to... As to those, and when you signed up for the click-based campaigns, we all agree they agreed to refund you for bad clicks. They make that statement. They make that statement. When you sign up for the impression-based campaigns, for which you're charged, I don't know, less than a hundredth per encounter than you are for clicks. Is there any explicit statement in the record that the clicks won't be... That impressions from people from fake accounts won't be counted? Or are you relying on inferences from other things? There is no statement in the record that says we will not bill for impressions from fake accounts. There are certainly... But your argument is that you're nonetheless entitled to refunds on those accounts the same way you would have been entitled to refunds on the click-based accounts, correct? That is correct, Your Honor, because our claim encompasses the broader business practices of charging advertisers on its platform and collecting money from clicks and impressions generated by fake accounts, because this is contrary to Facebook's authenticity policy and the many representations of its authenticity policy, which have taken the form and included, but are not limited to, the invalid click statement, which the court focused on, the real name statement, the right people statement, and Facebook's terms of service. The invalid click statement is for the click-based accounts, right? Yes, Your Honor. I mean, and they charge you a lot more for clicks than they did for impressions. Yes. So when I look at this, it's somebody saying, look, you want a Cadillac? You can buy the Cadillac, and if it's got any problems, we'll take it back. You want to buy this other stuff, you get a bunch of impressions, we won't charge you very much, and so why should I infer as to those that they were going to offer you the same refund deal that they did on the click-based ones? I'm sorry. Could you repeat your question, Your Honor? Sure. Your argument is that they should have refunded for impression-based accounts for invalid — for invalid impressions, not only — right? Yes. Anybody who — anybody who wasn't a true Facebook customer or hadn't complied with their policy, who looked at those accounts, shouldn't have been counted as one of the impressions. That's your position, correct? Yes. And my question is, why? Because you decided — you knew that there might be people who didn't fit that characterization, and on the click-based side, you negotiated a deal or they provided a deal that gave you a refund for those people. Why should I infer that they promised to do the same thing on the impression-based side? Because everybody knew they were invalid accounts. Nobody doubts that. But doesn't the whole — doesn't the absence of such a refund policy on the other side make perfect sense? I don't think so, Your Honor, because basically, if the district court's correct, you're saying that it's okay — I mean, it's a violation of the 17-200 to charge advertisers for invalid clicks on advertisements, but it's not a violation to charge for impressions on ads from — That's exactly what the district court held. But that doesn't — So tell me why that's wrong. Because it doesn't comport with the rules of honesty and fair dealing, which 17-200 was designed to enforce. I mean, Your Honor, as our client testified multiple times — and I can read you exactly from the record — where he read all the statements together, and it's not that there aren't — yes, he knew fake accounts may be out there, and it's not that — whether or not they would be interacting with his advertisement. He's saying, I shouldn't have to pay for it if they do. And is there a statement that says they won't? No, there's not. But if you go into the restaurant, Your Honor, there's no statement that says if they deliver your food and there's bugs in it or a rodent in it that you're not going to pay for it. But that's understood. Well, but if you go into — my background is in men's retail. And you go into a clothing store, and there's a sale pile that says, you know, final sale, no returns. And you see a white shirt there, and you see another white shirt on the shelf. If you buy the one from the pile that says no returns, you can't bring it back. If you buy the one on the shelf, you can bring it back. And it seems to me they distinguished here between the sale items and the full-priced items. Well, I'm not so sure I agree that the impressions is necessarily considered a sale item. I mean, for one thing, our client was defaulted into that billing method. I don't believe it was one he chose. Secondly, he was billed on what's called optimized impression basis. And what the optimized means is they specifically choose and deliver the ads. And they're billing on impression basis, I admit that. But they're delivering ads to Facebook users who are most likely to click on it. That's why it's optimized. So and our experts show that even though he was billed for some of these ads, they did click on it. Some of the fake accounts did click on the ads. So he did get — But isn't that the click-based argument? Well, the distinction I make, Your Honor, is I'm specifically talking about the 53 ad campaigns where he was billed on an optimized impression basis. But even on those, we were able to show that the fake accounts did click on those ads, Your Honor. Counsel, let me ask you this. I thought the genesis of this complaint was that there were misleading statements made by Meta regarding whether it would charge for clicks. But if that's the case, how can you say that the same analysis applies if there were no misleading statements about impressions? I'm not following how you led up to the impressions starting off with the misrepresentation claim. Well, our original — the complaint that the court — so if you remember the procedural history here, our case was dismissed initially. We moved to file a second amended complaint, and the court allowed us to file that complaint. In its order, they specifically — he specifically identified a handful of statements, determined they were puffery, and said, please don't include those in your complaint. Right. And we've made great — took great care not to do it. But then the complaint that was filed with the court's approval said, amongst other things, it asked for a class of all persons or entities within the United States who paid Facebook for advertising based on impressions delivered to or actions generated through fake accounts. It was not limited to invalid clicks. And there's — And you were billed on those — I'm sorry, Judge. You were billed on those accounts, regardless of whether there was a click. You were billed on those impression-based accounts simply on the basis of an impression, correct? Yes. I believe so. Okay. Sometimes people — sometimes people who impressed, if you want to use the term, looked at the site also clicked. But you weren't billed extra because they clicked. Your question is, we weren't billed on the optimized impression basis because they clicked. Right. You were billed because there was an impression. Correct. But what I'm trying to — Sometimes people who go to an account end up clicking on something on the account. But that wasn't — you were billed on those accounts regardless of whether they clicked or not, correct? The click was not the trigger for the billing. Yes. So the answer to my question is yes. I believe so. Okay. So we're still back to Judge Rawlinson's question. As I read this case — and I'm trying to make your argument, so tell me if I'm wrong about it — you say, well, they didn't directly say that they wouldn't bill us for invalid clicks on the impression accounts. But they made a lot of statements about how we're a great person to deal with and you'll get real customers and, you know, the three things that the judge identified as actionable statements, if not true. But I guess my question to you is, everybody went into this knowing that there were lots of fake accounts on Facebook. I mean, they told you in their materials. We do about 90 percent. We think we verify 90 percent. Ninety percent of people follow our policies. So I'm still trying to figure out why, for this impression-based account for which you were billed fractions of a penny per impression, you thought you were — you thought that all these statements represented to the public that they would get exactly the same deal in terms of refund that they would have gotten on an account where you were paying 70 cents per click. Okay. Let me unpack your question a little bit, if I can, please. The first point is whether or not there are — I knew there were fake accounts out there. That doesn't mean that I necessarily agree to pay for fake accounts to interact with my advertising. That's a different concept. Okay. So tell me why — but I'm saying, tell me on this case why it is, knowing that there were fake accounts, knowing that you'd signed up for a campaign that charged by impression, a reasonable person should have looked at all these materials and said, hey, they're going to give me refunds for clicks on fake accounts on impressions. What's — tell me — tell me what they — what tells me that, other than the statements that you identified, that survived a motion to dismiss? I mean, the standard here is a reasonable advertiser. And I say that our client certainly is one. And he says, well, he says, what I'm talking about initially are the terms of the Facebook terms to put up an account on Facebook. I mean, that's where we start. That's very clear, the fact that you are who you say you are if you're going to be on this platform. And then, when you go into the advertising terms, that's another set of terms that really and truly confirms the Facebook terms, that we are — that you're a true person, you are talking to and working with people that are real people. And I think I made it clear that I took all these statements in their entirety to allow me to rely that Facebook was a safe place to advertise. And we've gotten to — this is what I was hoping you were going to say earlier because this is what I wanted to focus on. So your position is your client's statement about how he read everything — I can use he — is enough to create a jury question on whether a reasonable advertiser would have been misled? Well, it all comes from the authenticity policy that Facebook brags about. The right name statement, the terms of service, the invalid click statement, they all flow from that, which is that Facebook's — I know I'm taking you over, but this is important to me in this case. Sure. So I want to give you a shot at it. When I look at all these statements — I'm not an advertiser, I'm not even a reasonable advertiser — I would say, boy, I can't figure out why anybody would have thought he wasn't going to be billed for invalid impressions. But your client's an advertiser, and you say he's a reasonable one. And so my question is, is that — assuming that I'm right, that the face of all this stuff to a third party, to a judge, doesn't get me there, as it didn't get Judge Ossoff there, is it enough to get to the jury that somebody who's in the advertising business says, no, no, I'm a reasonable advertiser, and I read this stuff, and I think that's enough to create a jury question? Yes. Okay. Exactly. All right. Counsel, you've exceeded your time. We'll give you a minute for rebuttal. Thank you, Your Honor. Good morning. May it please the Court. Beth Brinkman appearing on behalf of Meta, formerly Facebook. The District Court correctly entered summary judgment for Facebook and denied class certification should be affirmed. This case is about a claim that plaintiff was injured because of an alleged misrepresentation that it would not be charged for invalid clicks on advertisements that it placed on the Facebook site. The District Court correctly held that plaintiff was not charged for any invalid clicks, so and explained that the key statement was thus not a violation of California Section 17200. Judge Ossoff held a series of hearings, allowed plaintiff to amend their complaint a second time, issued a number of separate orders on a motion to dismiss, to amend class certification and summary judgment, but plaintiff showed no economic injury, no charge for invalid clicks, so it does not survive summary judgment on the 17200 claim. Affirmance of that class certification denial follows from that. There's no claim. There can be no class. Plaintiff's not an adequate or typical plaintiff for anything else for a class certification. Counsel, can we – I think your friend says, I really don't have any evidence on the click side, argues that the judge should have allowed them to get more or whatever. So focusing on the impression side for a second, can you answer the question that I just asked your friend? We're supposed to put our mind – ourselves in the mind of a reasonable advertiser, which maybe one of my colleagues has once been, but I have never been. And an advertiser comes in and says, I read all this stuff, and what I got out of it was the complaint that they make. Does that create a jury question? If not, why not? No, Your Honor. First, we think that this case is about the invalid click statement, so there's no dispute about that. Yeah, and I don't think there is. If we go to the impression, we think there's no 17200 claim that's been stated on the impression because there's no alleged misrepresentation that mentions impressions. Let me try again to make the other side's case, which I was trying to get them to make so that I understand it. They say, well, yeah, there isn't a statement that's expressly false. But there's lots of statements that would lead a reasonable advertiser to the assumption that you would not charge us for false impressions. And I'm a reasonable advertiser, and that's the way I read it. So why doesn't that get them to the jury? Okay. Let me, I think, take that in two steps. One is the authenticity policy. I think that's what Your Honor is really going to. Plaintiff tries to invoke this amalgam of various statements in all kinds of locations that says there's an authenticity policy. And that's what we relied on, and that's the injury. Well, that claim is not actionable under 17200. The district court correctly found that. There is no alleged misrepresentation that's specific enough. To go to your exact question, we discuss at pages 29 to 32 of our brief that the Clemens case, the Smith case, explains that your personal experience, your vague sense of what a company should do, does not state an allegation of a misrepresentation. Just because someone thinks that's what a business should do, that doesn't mean there's any statement, particular statement, identified as alleged misrepresentation. Can I ask you a procedural question? Uh-huh. I don't understand them to be attacking the judge's ruling on allowing the filing of the second amended complaint. In other words, I think, as I read the case, they're trying to keep themselves within the boundaries of the alleged misstatements in the second amended complaint. I'll ask your friend that, too, but I think that's right. So I don't know that we need to go back and review the statements that the judge said didn't count, but maybe I'm wrong about that. What do you think? Are we looking at that, too? I think you're right, Your Honor. I think that the only actionable 17200 claim here is about the Cliffs statement, if I can be clear why. There's nothing about charging advertisers in any of these vague notions about an authenticity policy. Let me make two really practical points why that really makes a difference here. These authenticity policies, promoting a business, promoting a product, nothing about how you're going to charge an advertiser. There could be an annual flat fee for advertising. It just says nothing about how they're going to charge advertisers. Moreover, I wanted to go to your Cadillac example for a moment, Your Honor, because I really do think that is very useful here, although I'm not going to talk about cars or even clothing, but my dad worked for a grocery store, so I want to talk about produce. If you're shipping produce and you're shipping table grapes, when you get that bunch of table grapes at home, there's probably going to be a grape in there that's not edible, maybe one amongst that. Nobody expects that you're going to take that grape back and get a refund. That's just not a reasonable assumption. I think that Your Honor really talked about the difference between click charges and impression charges, for example. The transaction costs would have to be taken into account and what effect it would have on the cost of advertising to begin with. If you're talking about what's reasonable and all, they don't have that evidence here. They don't have an alleged misrepresentation about impressions at all. The authenticity policy is not about what advertisers are charged, and they would need much more than that to make a case here. Just going to your practical bottom line, if it were a pomegranate or some very expensive fruit and it was packaged individually, it was different. But here, Facebook does everything it can to keep abusive accounts off its site. It has every incentive to do that. Some slip through. They make no ---- Let me ask you this. Let me ask you the procedural question differently because it's what gives me a little bit of pause in this case, and I need your help. The judge says these three statements are actionable by allowing the amendment of the complaint. If you can prove these up and prove that a reasonable advertiser would have understood them to make a promise, was he talking about only the click-based accounts or was he talking about the impression-based accounts? What he was talking about was what was in this case. Right. And there were three statements having to do with, like, one misrepresentation. And the key case, which everybody talked the crux of the case, is the clicks charge statement because that's the only one that has any representation about how you're actually going to charge an advertiser. Well, see, I'm trying to figure out what the judge was doing procedurally. Right. Procedurally. He's a very good judge, I mean, whether he's right or wrong in this case. And he says there's three actionable statements here. And then he gets the summary judgment and he says, well, there's no evidence on the click-based side, so I'll deal with that. And on the impression-based side, I hold against you, dot strategy. And I'm trying to figure out, did he hold against them, why, for an absence of evidence? I mean, he already said these statements might be actionable. They were proved up. This side said, and we read them as promising something that I don't read them as promising, but the district judge let it get past the pleading stage. So I'm trying to figure out what happened at summary judgment. What he held was there was no actionable statement other than the main statement about the click statement. I just want to be clear. The other two statements, the name statement, the court actually said during the class certification ruling, it's not independently actionable. He let that statement and the statement about real people be considered along with the key crux of the case, which was the claim, the only one that had any advertisers. So that's the package. So your view is what the judge did here is say, you get past the motion to dismiss. There's an important statement here about clicks, and if you can show that you were mischarged. And these other two are supportive but not independently? Yes. I don't think it matters if they're independent or not, but I think that's what the judge did. My problem was if they were independent, then I'm having trouble figuring out what happened on summary judgment that shouldn't have happened on the motion to dismiss. I think I can say this. When you look at the name state, for example, it says nothing about advertising charges whatsoever. It just says people use their real name. There's no independent 17-200 claim. Regardless of what the court may have held, I mean, there is no allegation that you can't make out the claims of the 17-200 on, you know, people use their real name. It just says nothing about advertising. As, again, it could be a business that said, we're going to have a flat fee for annual advertising. There's just nothing about that. Then you go to the other one, that statement about the right people. I should say, Your Honor, it is really classic puffery. That statement says, you know, you'll get to the right people who will love your business. That is not an actionable 17-200 claim independently. It's puffery. It's not something that could be proven. But the court generously allowed that to be considered along with the Clicks statement. But none of those would support a claim either for Clicks or for Impressions. Those say nothing about, you know, charging advertisers. They don't, and they certainly could not be any kind of misrepresentation about what plaintiff is claiming here. Plaintiff here is claiming a right to an audit of every account that is removed from Facebook as abusive and then a refund for that. The Foster Declaration, which did it for this one thing, goes through and explains that. And that gets back to the transactional cost. Like, as Your Honor said at the beginning, it's just not reasonable for anyone to assume that that would be done in every instance. Again, that is not before the court. What is here is the 17-200 claim under the Click charges statement, and there was no evidence that there was any charge for invalid clicks. To put it differently, this is not a contract case. No. We're not trying to figure out whether the parties had a meeting of the minds that may not be apparent on the face of this. The question is whether or not these statements were materially misleading. That's, well, whether they, yes, whether they can meet a 17-200. And I would say this, Your Honor, if you're going to move away from the actionable statement of the Clicks charge statement and move into these amorphous Facebook is great authenticity policy, you would also then have to go back and look at the disclaimer language, which, unlike the Click charge statements, and this goes to the class certification, you know, correct ruling, there's no evidence that the plaintiffs were exposed to that. What they were exposed to were the self-serve ad terms. And the self-serve ad terms has a disclaimer that explains that Facebook can't guarantee the clicks and they're not responsible for click fraud. So they would have seen that. That was in the self-service ad terms. So if you're going to step back and start looking at other things, but here we moved for summary judgment not on the misrepresentation issue on two grounds about standing, that there was no injury, and also that there was no reliance, which is an alternative ground you could affirm on. And the class certification, as I said before, the denial was correct because it flows when there's no claim. But I should also note that Judge Allsop actually denied class certification before summary judgment and has a, you know, very astute analysis of why there was not exposure here. Again, these, the click. But that analysis was for the impression-based class, was it not? That was the way that the plaintiff tried to claim his class certification, but what Judge Allsop correctly did was look at the statements that he said were actionable under 17-200, the click charges statement, and then also the name statement and the right people statement. Those each appear on a single page and thousands of pages on the web. They're not something that any advertiser needed to see, needed to go to before, after, or during. They were not in the self-cert ad terms. But I take it your argument is not that they were buried somewhere, but that even someone who read them would not have reasonably gotten the impression that they were stating that we're not going to charge you for false impressions, if you will. That's correct. There's no reference to impressions in those statements whatsoever. There is no reference whatsoever to charging advertisers in any of the authenticity policy in any of the other statements. It's only the click charge statement. And that's why, you know, to try and invoke this vague authenticity policy that doesn't make out a 17-200 claim or to somehow try and shoehorn impressions into the statement about clicks as they try to do with the optimized impressions where you can have clicks afterwards, as your honor pointed out. It doesn't matter. They're not charged. You're charged for impression, regardless of whether there are any clicks. So, yes, we think in that sense that the determination here, the straightforward way of resolving the case, which Judge Alsop did was say there's no evidence of injury here from the clicks, and that these statements do not support a 17-200 claim for impressions. There's nothing in them about impressions. There's no representation that could be misleading. Plaintiffs concede that this is not a perfect system. Facebook does everything they can to keep abusive accounts off, but there's no representation for every impression they're going to audit. Every abusive account that is taken down, go through that and then look for every impression that was made and whether there was an injury to the plaintiff because the value was lost. They simply make no case on that. Summary judgment was appropriate here on those grounds. Thank you, your honor. Thank you, counsel. Rebuttal. Rebuttal. We have one minute of rebuttal, which I hope to not expire. The district court was wrong to limit the case to invalid clicks. 17-200 is a claim in equity designed to enforce the fundamental rules of honesty and fair dealing, and a reasonable advertiser would likely be deceived as a standard to apply in a 17-200 case. And certainly, as Mr. Dozier testified, he believed by all the statements taken together holistically that he would not be charged for anything that had to do with a fake account. Counsel, where is that allegation in the complaint that based on all of the materials produced by Meta, he believed that he would not be charged? Take us to the allegation in the complaint. Because the district court judge looked at the allegations in the complaint to determine whether or not there was a misrepresentation, because that was how the district court interpreted the complaint as reading. So I'm asking you, what in the complaint asserted that reading all of the evidence together constituted a misrepresentation? Yes, your honor. And I'll cite to the record if you give me a moment, please. All right. In paragraph 18, which is a plaintiff's excerpt of record at 118, plaintiff's analysis of its own Facebook advertising campaign results reveals it was charged and paid for actions generated through fake accounts, and Facebook has failed to refund the money paid by plaintiffs for those actions. And the other one is on paragraph 45 of the appellate's excerpt of record at 126. Additionally, plaintiff reasonably believed that because Facebook requires everyone to provide their real names, it would not be charged for advertising that interacted with fake accounts. But those don't say that there was a misrepresentation or anything deceptive or misleading in those materials. I'm sorry, your honor? Those allegations don't say that there was anything deceptive or misleading in those materials. It's saying what your client believed, but isn't saying that there was a misrepresentation by Meta. Well, here's another one. It says, this is paragraph 10 of the excerpt of record at page 115 to 116. Indeed, fake accounts violate Facebook's terms of service and Facebook's authenticity policy, which requires users to use their real identities when they create an account on Facebook. Do you think that is alleging a misrepresentation or a deception by Meta? That's one of them, yes, your honor. What's the misrepresentation in that? I'm sorry? What's the misrepresentation? The misrepresentation is that Facebook, one, requires people to use their real names and real identities when they come on the platform, and two, that Facebook enforces that policy. That's a policy of Facebook. But how is that a misrepresentation to your client, though? Because our client believed that because everyone, before they signed up for Facebook, agreed to use authentic identifying information, that he would only be charged for people that follow the terms of Facebook. I mean, in the very definition of invalid clicks, they talk about one version of invalid click is ones that don't follow the terms of Facebook. So the fact that it doesn't follow the terms of Facebook certainly puts it into the category of things that aren't allowed. So is it your argument that your client's belief is the equivalent of a misrepresentation by Meta? I think when Meta represents that everyone here is of a certain character and they entice my client to advertise because of that character, the authenticity, and then that doesn't — But they made as clear as they could that there were plenty of invalid accounts out there. They said in their materials, you know, we think about — we're trying really hard, but we still think about 11 percent of these may not be valid accounts. So they never represented to you that every account was valid. You seem to be claiming that they represented that somehow they would check every time there was an impression to make sure it was valid. And tell me, I can't find that in me. No, Your Honor. Our position isn't that we expect Facebook to guarantee everybody to be on there to be real. What we're saying is if they are on there and they're not authentic, that we shouldn't be charged for any interactions. I understand. It's not that we didn't know or didn't expect there to be fake accounts. It's that we didn't expect to be charged for them. That's the distinction, I think, of importance. So as a practical matter, you got thousands of impressions in your 53 non-impression, non-click-based campaigns. Yes. And you think that what Facebook was promising was that they would audit those thousands of impressions to determine which ones came from real accounts? No, Your Honor. I think, well, we're not asking quite that. What we're suggesting and saying that Facebook should be doing as a fair business practice is that once they do discover an account is fake and they remove it for violating Facebook's terms for not being authentic, at that point they should then go back and see if that account interacted with advertising and Facebook collected money for those charges. Because as it sits now, Facebook gets money from fake accounts which offer no commercial benefit to the advertiser. Understood. Thank you. Thank you, counsel. Thank you to both counsel. The case just argued is submitted for decision by the court. The final case, Priscilla v. New Penn Financial, has been submitted on the briefs. That completes our calendar for the day, and we are in recess until 9.30 a.m. tomorrow morning. All rise.
judges: RAWLINSON, HURWITZ, Cardone